VIOCK ET AL., APPELLANTS, *v.* STOWE-WOODWARD COMPANY, ETC., ET AL., APPELLEES.

(No. E-83-13—Decided August 19, 1983.)

*Mr. Kirk J. Delli Bovi,* for appellants.
*Mr. Tybo A. Wilhelms,* for appellees.

WILEY, J. This is an appeal from summary judgment entered April 18, 1983, by the Erie County Court of Common Pleas. Upon our review of the pleadings, accompanying memoranda, evidentiary materials, and depositions contained in the record now before us, the following facts are revealed.

## I

Appellants in the instant case are Carl Viock, his wife, and his children. Appellees are appellant Carl Viock's employer, Stowe-Woodward Company ("Stowe-Woodward") and Roger Gravlin, plant manager at Stowe-Woodward. Appellant Carl Viock began his employment with appellee Stowe-Woodward in January 1968. Appellant's employment continued until it was terminated in June 1981. During this employment period of approximately thirteen years, the only position which appellant held was that of "roll-coverer."[1] In this position of roll-coverer, appellant was exposed to rubber dust and a number of chemical substances.[2]

Appellant was first hospitalized in January 1976, for approximately one month and was subsequently diagnosed as suffering from "[d]iffuse pulmonary infiltrate, bilateral, probably secondary to chemical pneumonitis." Appellant's treating physician released appellant to return to work in May 1976, but appellant was advised by his doctors to secure another position that was in an environment free of dust and chemicals.

Appellant inquired into the possibility of acquiring employment in a dust and chemical-free environment at Stowe-Woodward, but was informed that the only position available to him was his current position as roll-coverer. Appellant

---

[1] As a "roll-coverer," appellant would place rubber sheets onto rollers.

[2] These substances included, *inter alia,* petroleum naptha, ketone, toluene, xylene, isobutyl ketone, hexane and heptane.

made several attempts to obtain employment elsewhere, but these attempts were unsuccessful. Unable to find such a position, appellant continued his employment at Stowe-Woodward as a roll-coverer.

At the request of appellee Stowe-Woodward, appellant was examined by the company's physician on May 11, 1981. The examining physician concluded that the only way to effectively manage appellant's health problem was to totally remove appellant from the "offending environment." The examining physician further reported that for the sake of appellant's health, appellant should not be employed in any capacity at Stowe-Woodward. Consequently, on June 5, 1981, appellant Carl Viock was terminated from Stowe-Woodward's employment.

Appellants filed a law suit in the Erie County Court of Common Pleas on February 5, 1982, naming as defendants Stowe-Woodward and plant manager, Roger Gravlin, appellees herein. The first cause of action set forth in appellants' complaint concerns appellant Carl Viock. In count one, said appellant alleges that beginning with the commencement of his employment in January 1968, he has inhaled and ingested toxic substances in quantities far exceeding the acceptable level prescribed as permissible by the United States Department of Labor, Occupational Safety and Health Administration. Further, appellant avers that his employer knew and/or should have known that he was being subjected to the inhalation and ingestion of toxic substances, and that appellees fraudulently, intentionally, and/or maliciously caused him to be exposed to dangerous levels of toxic substances as a condition of continued employment.

In his second count, appellant Carl Viock alleges that Stowe-Woodward fraudulently, intentionally, and/or maliciously disguised working conditions and withheld and/or concealed from appellant and his doctors material information and warnings concerning the toxic substances to which appellant was exposed, and that appellee Stowe-Woodward knew the health hazard which would result from continuous, repeated exposure to the substances.

In counts three and four of his cause of action, appellant alleges that appellees wrongfully refused to pay him the sickness and accident benefits to which appellant claims he was entitled, and that appellees fraudulently, intentionally, and/or maliciously terminated his employment. The second cause of action in appellants' complaint concerns appellant's wife and children. These appellants allege that as a direct and proximate result of appellees' fraudulent, intentional, and/or malicious conduct, appellant-wife has suffered a loss of consortium with her husband; appellants' children allege that they have incurred the loss of support, services, and prospective inheritance.

Appellees filed their separate answers on April 9, 1982, and their motion for summary judgment, along with their evidentiary materials, on April 26, 1982. Subsequently, appellants filed their memorandum in opposition to appellees' summary judgment motion, together with their evidentiary materials. The evidentiary materials were limited by the trial court to the issue of whether the statute of limitations barred recovery as to counts one and two of appellant Carl Viock's first cause of action. The trial court granted appellees' motion for summary judgment concerning counts one, two, three and four of appellants' first cause of action and dismissed appellants' entire complaint, with prejudice. In granting summary judgment in appellees' favor, the trial court held that counts one and two of appellant Carl Viock's first cause of action were barred by the applicable statute of limitations, and that as to counts three and four, appellant Carl Viock was bound by the result of the arbitration hearing as provided in the collective bargaining

agreement entered into by Stowe-Woodward and U.A.W. Local 393.[3]

It is this judgment from which appellants now appeal, stating as their first assignment of error:

"The lower court prejudicially erred in granting summary judgment in favor of defendants on counts one and two of plaintiffs' first cause of action for the reason that the asserted claims were barred by the applicable statute of limitations."

## II

At the outset, the focus of our analysis must be upon the applicable

---

[3] It also appears from the record that appellant Carl Viock had filed a claim with the Bureau of Workers' Compensation. The record contains appellant's affidavit captioned "State of Ohio — Bureau of Workmen's Compensation — Claims Section." Also, a "Specialist's Report" is in the record on a form provided by the State of Ohio, Industrial Commission. Further, the record indicates that a hearing was conducted before a District Hearing Officer, and that appellant's claim was recognized for "chemical pneumonitis bilateral pulmonary fibrositis."

From these evidentiary materials contained in the record, it definitely appears and it may be fair to surmise that appellant processed a workers' compensation claim. This court is indeed mindful of the Supreme Court's holding in *Blankenship* v. *Cincinnati Milacron Chemicals* (1982), 69 Ohio St. 2d 608 [23 O.O.3d 504], wherein the court held that an employee is not precluded by the Ohio Constitution or by the workers' compensation laws from enforcing his common-law remedies against his employer for an intentional tort.

The question that remains, however, is whether an employee who is found by the Industrial Commission to have been injured "in the course of or arising out of his employment," may also recover against his employer for an intentional tort. For, as the *Blankenship* court, at 613, quoted from this court's decision in *Delamotte* v. *Midland Ross* (1978), 64 Ohio App. 2d 159, 161 [18 O.O.3d 117], "that where an employee asserts in his complaint a claim for damages based on an intentional tort, '* * * the substance of the claim is not an "injury

statute of limitations in the case *sub judice*.

### A

Appellant Carl Viock's cause of action seeks redress for the injuries which he sustained from the alleged inhalation and ingestion of toxic substances while employed at Stowe-Woodward. Appellant contends, however, that since it is alleged that the exposure was the result of appellees' fraudulent, intentional, and/or malicious conduct, the four-year limitation for fraud (R.C. 2305.09[C])[4] rather than the two-year limitation for bodily injury (R.C. 2305.10)[5] is applicable.

---

* * * received or contracted by any employee in the course of or arising out of his employment" * * *.' "

Thus, if an employee receives workers' compensation for the same injuries for which he then claims were the direct and proximate result of the employer's intentional tort, it would initially appear that the two are inconsistent and, therefore, mutually exclusive.

However, that issue was not raised or briefed by any of the parties to the instant appeal and we save for another day our decision on that question.

Our examination of the record discloses the following:

(a) Appellant Carl Viock's affidavit to the Bureau of Workers' Compensation is dated December 7, 1976;

(b) The Industrial Commission Specialist's Report is dated April 23, 1982;

(c) The findings of the hearing officer regarding the employer's C-86 filing are dated October 20, 1982, and were mailed on October 26, 1982.

---

[4] R.C. 2305.09 materially provides:

"An action for any of the following causes shall be brought within *four years* after the cause thereof accrued:

"* * *

"(C) For relief on the ground of fraud; * * *" (Emphasis added.)

[5] R.C. 2305.10 states in part that:

"An action for bodily injury * * * shall be brought within *two years* after the cause thereof arose." (Emphasis added.)

The trial court's judgment entry does not expressly address which limitation period is applicable. The lower court's judgment entry does state, however, that the alleged conduct of appellee Stowe-Woodward does not toll the applicable statute of limitations, whether that statute be R.C. 2305.09 or 2305.10. Further, the trial court stated that the alleged conduct of appellee Stowe-Woodward does not "change the nature of the employee's [appellant's] cause of action from one for fraud to personal injury or intentional tort or vice versa [*sic*]."

"The period of limitation within which an action must be commenced, is determined from the nature of the demand and the ground of the action as set out in the pleadings." *State, ex rel. Lien,* v. *House* (1944), 144 Ohio St. 238, 244 [29 O.O. 399]. Restated, the applicable statute of limitations is not determined from or by the form of pleading, but rather by the gist of the complaint. *Hibbett* v. *Cincinnati* (1982), 4 Ohio App. 3d 128, 131. As the Supreme Court held in *Andrianos* v. *Community Traction Co.* (1951), 155 Ohio St. 47, 50-51 [44 O.O. 72]:

"* * * [W]here a statute, specific in terms, limits the time within which an action for 'injuries to the person' or 'bodily injury' may be brought, *such statute governs all actions the real purpose of which is to recover for an injury to the person* * * *

"* * *

"* * * [R.C. 2305.10][6] is not confined to any particular type of injury, nor does it concern itself with the circumstances under which an injury was inflicted. On its face, it clearly covers all actions based on a claim respecting bodily injury.

"Surely, the General Assembly did not intend to create different periods of limitation for the recovery of damages growing out of bodily injury, depending on the form of the action brought. No matter what form is adopted, the essence of the action is the wrongful injury * * *." (Emphasis added.)

This court determines that when the Supreme Court's holding in *Andrianos, supra,* is applied to counts one and two of appellant Carl Viock's cause of action, appellant sought recovery of damages growing out of his bodily injury and it was appellant's bodily injury which was the gist of counts one and two of his first cause of action. Accordingly, we hold that in the case *sub judice,* R.C. 2305.10 is the applicable statute of limitations.[7]

B

Having determined that R.C. 2305.10 is the applicable statute of limitations in the present case, we now must decide whether appellant Carl Viock's cause of action for his bodily injury is barred by the application of R.C. 2305.10. This decision necessarily requires us to review the record before us and determine whether the trial court improvidently granted summary judgment to appellees.

The Supreme Court, in *Norris* v. *Ohio*

___

[6] The Supreme Court, in *Andrianos, supra,* was discussing G.C. 11224-1. It is important to note that this particular section of the General Code was the predecessor to R.C. 2305.10.

[7] For other cases in which an issue concerned the proper statute of limitations, see *Peterson* v. *Teodosio* (1973), 34 Ohio St. 2d 161 [63 O.O.2d 262]; *Dean* v. *Angelas* (1970), 24 Ohio St. 2d 99 [53 O.O.2d 282]; *U.S. Fidelity & Guaranty Co.* v. *Truck & Concrete Equip. Co.* (1970), 21 Ohio St. 2d 244 [50 O.O.2d 480]; *Muir* v. *Hadler Real Estate Mgmt. Co.* (1982), 4 Ohio App. 3d 89; *Grimm* v. *White* (1980), 70 Ohio App. 2d 201 [24 O.O.3d 257]; *Rudnay* v. *Corbett* (1977), 53 Ohio App. 2d 311 [7 O.O.3d 416]; *Globe American Cas. Co.* v. *Goodman* (1974), 41 Ohio App. 2d 231 [20 O.O.2d 447]; *National Car Rentals* v. *Allen* (1964), 1 Ohio App. 2d 321 [27 O.O.2d 417]; *Farbach Chemical Co.* v. *Commercial Chemical Co.* (1956), 101 Ohio App. 209 [1 O.O.2d 146]; *Swankowski* v. *Diethelm* (1953), 98 Ohio App. 271 [57 O.O. 312]; *Cox* v. *Cartwright* (1953), 96 Ohio App. 245 [54 O.O. 281].

*Std. Oil Co.* (1982), 70 Ohio St. 2d 1, 2 [24 O.O.3d 1], stated:

"Summary judgment is a procedural device to terminate litigation and to avoid a formal trial where there is nothing to try. It must be awarded with caution, resolving doubts and construing evidence against the moving party, and granted only when it appears from the evidentiary material that reasonable minds can reach only an adverse conclusion as to the party opposing the motion."

Thus, as we proceed to determine the appropriateness of the trial court's award of summary judgment to appellees, we must decide whether, when the evidentiary material is construed in the light most favorable to appellants and any doubt is resolved against appellees, appellees, nevertheless, were entitled to summary judgment.

The trial court awarded summary judgment to appellees on the basis that appellant Carl Viock's claim was barred by the applicable statute of limitations without expressly stating which limitation statute was applicable. We have determined that question and decided that the two-year limitation period set forth in R.C. 2305.10 applies to Viock's bodily injury claim. The purposes served by the rationale underlying statutes of limitations are to insure fairness to the defendant, to encourage prompt prosecution of causes of action, to suppress stale and fraudulent claims, and to avoid the inconvenience engendered by delay, specifically the difficulties of proof present in older cases. *O'Stricker* v. *Jim Walter Corp.* (1983), 4 Ohio St. 3d 84; *Harig* v. *Johns-Manville Products Corp.* (Md. App. 1978), 394 A. 2d 299, 302.

In light of these above considerations, the Supreme Court, in *O'Stricker, supra,* adopted what it considered to be a liberal policy of construction regarding R.C. 2305.10, when the court stated in paragraph two of the syllabus:

"When an injury does not manifest itself immediately, the cause of action does not arise until the plaintiff knows or, by the exercise of reasonable diligence should have known, that he had been injured by the conduct of defendant, for purposes of the statute of limitations contained in R.C. 2305.10."

This "discovery rule,"[8] as articulated by the Supreme Court in *O'Stricker, supra,* is a two-pronged rule requiring both prongs to be satisfied before the statute of limitations begins to run. First, a plaintiff must know or reasonably should have known that he has been injured; and second, a plaintiff must know or reasonably should have known that his injury was proximately caused by conduct of the defendant. Upon actual knowledge or reasonable cause shown to have knowledge of these factors imputed as a matter of law, the limitation period in R.C. 2305.10 begins to run. This articulation of the "discovery rule," we note, is consistent, congruent, and harmonious with articulations in other jurisdictions which have adopted and applied the discovery rule. See, *e.g., Schiele* v. *Hobart Corp.* (Ore. 1978), 587 P. 2d 1010, 1014 ("The statute of limitations begins to run when a reasonably prudent person associates his symptoms with a serious or permanent condition and at the same time perceives the role which the defendant has played in inducing that condition.")[9]; *Nolan* v. *Johns-Manville Asbestos &*

---

[8] The Supreme Court also recently has held that the "discovery rule" is applicable in medical malpractice, *Oliver* v. *Kaiser Community Health Found.* (1983), 5 Ohio St. 3d 111, and in legal malpractice, *Skidmore & Hall* v. *Rottman* (1983), 5 Ohio St. 3d 210.

[9] Further, the Oregon Supreme Court expanded upon its interpretation of the discovery

rule in *Hobart, supra,* at 1014, that merely a plaintiff's knowledge of symptoms in their causal relationship to defendant's actions does not, in and of itself, commence a running of the statute of limitations. The Oregon Supreme Court continued:

"We do not believe the legislature intended that the statute be applied in a manner which

*Magnesia Materials Co.* (Ill. App. 1979), 392 N.E. 2d 1352, 1359 ("* * * the statute of limitations commences when the injured party discovers or should reasonably have discovered not only the nature of the affliction but also that it was wrongfully caused. * * * In cases involving a disease resulting from neglect, negligence * * * we believe that the more logical and tenable position is that the cause of action accrues and the statute of limitation begins to run when the diseased party discovered or should have discovered that he is ill as a result of some neglect or negligence on the part of another party * * *.").

### C

Appellant Carl Viock essentially alleges that appellees fraudulently, intentionally and/or maliciously exposed him to dangerous levels of toxic substances during his employment at Stowe-Woodward. Further, appellant avers that appellee Stowe-Woodward fraudulently, intentionally and/or maliciously disguised working conditions and withheld and/or concealed relevant material information and warnings regarding the toxic substances from appellant and appellant's physicians. With these averments in mind, we now consider when appellant should have known that he was injured by appellees' conduct.

Initially, in his affidavit, appellant stated that since he began his employment as a roll-coverer at Stowe-Woodward, he was exposed to rubber dust and several toxic substances. In this regard, appellant further stated that, to the best of his recollection, he was never exposed to toxic substances in his previous employment.

Appellant was first hospitalized in January 1976, approximately eight years after he began his employment at Stowe-Woodward. At this time, the record reveals that appellant's illness was diagnosed as "[d]iffuse pulmonary infiltrate, bilateral, probably secondary to chemical pneumonitis." Appellant further stated in his affidavit that subsequent to his hospitalization in 1976, both he and his doctor informed appellee Stowe-Woodward that appellant should have a job which kept him away from dust and chemicals. In support of this statement, appellant has submitted a "return to work" form with the above recommendation contained therein.

To buttress the allegations contained in his complaint and appellant's statement contained in his affidavit that appellee Stowe-Woodward withheld information concerning the effects of exposure to toxic substances, appellant has submitted a letter to former Stowe-Woodward plant manager, W. M. Condrin, from the Ohio Department of Health, Northwest District Office. In this letter, dated April 24, 1978, Condrin was advised that "toluol" health hazards were present in processes involving rubber coverings of rollers. Appellant states in his affidavit that he was never informed of this hazard by Stowe-Woodward, even though Stowe-Woodward knew that the toluol concentration in appellant's working atmosphere exceeded permissible limits and that appellant had a health problem.

Although appellant admitted in his affidavit that he was aware of the probable link between his illness and his exposure to dust and chemicals,[10] appellant also stated that he did not realize until after his termination that appellees had acted

---

would require one to file an action for temporary sickness or discomfort or risk the loss of a right of action for permanent injury."

Thus, the Oregon Court held that the limitation period does not begin to run until:

"* * * a reasonably prudent person associates the symptoms with a serious or permanent condition and at the same time perceives the role which the defendant has played in inducing that condition." *Hobart, supra,* at 1014.

[10] Appellant's statement that in 1976 he was aware of only the "probable" link between

in a willful, intentional, and fraudulent manner. Further, even though appellant admitted in his deposition to using chemicals in his work at Stowe-Woodward as roll-coverer, he continued by stating that he did not know about the dangerous effect of the chemicals until 1981, when, at appellant's request, a chemist examined some chemicals which appellant provided and which appellant used at the Stowe-Woodward plant where he was employed.

Appellee Roger Gravlin, plant manager at Stowe-Woodward since June 1, 1980, stated at deposition that he did not initiate an inquiry to locate the sources of the chemicals hexane and heptane until he had received a copy of appellants' lawsuit.

Also, appellee Gravlin testified that prior to January 24, 1983 (two weeks prior to Mr. Gravlin's deposition), neither he nor anyone else at the Stowe-Woodward plant ever had possessed data sheets for certain chemicals for which data sheets now had been requested. Further, since appellee Gravlin began his employment as plant manager on June 1, 1980, Mr. Gravlin stated that he was not aware of any tests, other than a survey conducted on February 22, 1982, to determine the airborne levels of chemicals in the Stowe-Woodward plant.[11]

### D

We recognize that summary judgment, pursuant to Civ. R. 56, is a salutary

---

his illness and his exposure to dust and chemicals is supported by his doctor's diagnosis of "[d]iffuse pulmonary infiltrate, bilateral, *probably* secondary to chemical pneumonitis." (Emphasis added.) The level of certainty required for the limitation period to commence was discussed by the Oregon Supreme Court in *Hobart, supra,* at 1013-1014:

"* * * [T]he statute of limitations on claims involving negligent infliction of an occupational disease does not begin to run until the plaintiff knows, or as a reasonably prudent person should know, that he has the condition for which his action is brought and that defendant has caused it. Plaintiff's actionable condition in this case is alleged to be her *permanent injuries*. However, it still remains to be determined exactly what type of knowledge plaintiff must have before it should be said that she knew or should have known of her condition. Plaintiff argues that the statute of limitations did not begin to run until her physician diagnosed her disease and identified its source. We agree that the acquisition of such information from a physician would undoubtedly start the period running. However, we reject plaintiff's contention that nothing short of a positive diagnosis by a physician will have this effect. A plaintiff whose condition has not yet been diagnosed by a physician can have or, in the exercise of reasonable care, could have access to information which requires or would require a

reasonable person to conclude she is being seriously or permanently injured.

"On the other hand, we reject defendants' claim that knowledge of symptoms and their causal relationship to defendants' actions in and of itself initiates the running of the statute. We do not believe the legislature intended that the statute be applied in a manner which would require one to file an action for temporary sickness or discomfort or risk the loss of a right of action for permanent injury.

"The statute of limitations begins to run when a reasonably prudent person associates his symptoms with a serious or permanent condition and at the same time perceives the role which the defendant has played in inducing that condition. Of course, one's condition may deteriorate to the point where a delay in seeking medical attention is no longer reasonable and to further such delay would be to charge the individual with any knowledge which a medical examination would otherwise have disclosed." See *Williams* v. *Borden, Inc.,* (C.A. 10, 1980), 637 F. 2d 731.

[11] Although we do not decide the issue, we note that the rule in at least one jurisdiction of which we are aware, that being Oklahoma, is that a party who wrongfully conceals material facts thereby preventing a discovery of his wrong, or the fact that a cause of action has accrued against him, is not permitted to use the wrong advantageously by pleading the statute of limitations. *Borden, Inc., supra,* at 738-739.

procedure in the administration of justice. It is also, however, a procedure which should be used cautiously and with the utmost care so that a litigant's right to a trial, wherein the evidentiary portion of the litigant's case is presented and developed, is not usurped in the presence of conflicting facts and inferences. *Nolan, supra,* at 1363; see *Norris, supra,* at 1-2. It is settled law that "[t]he inferences to be drawn from the underlying facts contained in the affidavits and other exhibits must be viewed in the light most favorable to the party opposing the motion, * * *" which party in the instant case is appellant. *Hounshell* v. *American States Ins. Co.* (1981), 67 Ohio St. 2d 427, 433 [21 O.O.3d 267]; see *Far Eastern Textile, Ltd.* v. *City National Bank & Trust Co.* (S.D. Ohio 1977), 430 F. Supp. 193, 196. It is imperative to remember that the purpose of summary judgment is not to try issues of fact, but rather to determine whether triable issues of fact exist.

From the state of the record before us, the question of when appellant Carl Viock knew or reasonably should have known that he had been injured and that his injury was the direct and proximate result of the alleged conduct of appellees, is a genuine issue of material fact upon which reasonable minds may differ. Accordingly, appellants' first assignment of error is well-taken.[12]

## III

Next, we consider appellants' third assignment of error, which states:

"The lower court prejudicially erred in dismissing, without reason, plaintiffs' second cause of action."

Appellants' second cause of action involves, *inter alia,* appellant-wife's claim that she lost the consortium of her husband and the children's claim for damages, including the loss of support and services of their father.

In addressing appellants' third assignment of error, we initially state that a spouse's action for loss of consortium arising from bodily injuries suffered by the other spouse as the result of the tort of the third party is governed by the four-year limitation period set forth in R.C. 2305.09(D).[13] *Dean* v. *Angelas* (1970), 24 Ohio St. 2d 99 [53 O.O.2d 282]. See *Holzwart* v. *Wehman* (1982), 1 Ohio St. 3d 26; *Amer* v. *Akron City Hospital* (1976), 47 Ohio St. 2d 85 [1 O.O.3d 51]; *Kraut* v. *Cleveland Ry. Co.* (1936), 132 Ohio St. 125 [7 O.O. 226].

Consortium is defined as "the conjugal fellowship of husband and wife, and the right of each to the company, cooperation and the aid of the other in every conjugal relation." *Flandermeyer* v. *Cooper* (1912), 85 Ohio St. 327, 340-341. The Supreme Court, in analyzing a wife's

---

[12] The court, having determined that the question of when appellant Carl Viock knew or reasonably should have known that he had been injured by the conduct of appellee Stowe-Woodward is a genuine issue of material fact, notes that the Supreme Court, in *O'Stricker, supra,* held that the judiciary, absent legislative definition, determines when a cause of action arose. Further, in adopting the "discovery rule," the court believed it was a more liberal policy which would better serve the ends of justice than adhering to the "last exposure rule."

However, assuming appellant had discovered in 1976, that he was injured by his employer's conduct, the "last exposure" rule

seems to better serve the ends of justice than does the "discovery rule," if the tort is continuous and intentional. How can it be said that the statute of limitations for the last exposure has run before the last exposure has occurred? Cf. *O'Stricker, supra,* at 89; *Amer* v. *Akron City Hospital* (1976), 47 Ohio St. 2d 85, 93 [1 O.O.3d 51] (Celebrezze, J., dissent).

[13] R.C. 2305.09(D) states in material part:

"An action for any of the following causes shall be brought within four years after the cause thereof accrued:

"* * *

"(D) For an injury to the rights of the plaintiff not arising on contract * * *."

claim for loss of consortium, commented in *Clouston* v. *Remlinger Oldsmobile Cadillac, Inc.* (1970), 22 Ohio St. 2d 65, 72 [51 O.O.2d 96]:

"The 'gist' of the wife's action for loss of the consortium of her husband against a defendant who either intentionally or negligently causes injury to her husband is the direct hurt which she has suffered by reason of the loss of her husband's society, services, sexual relations and conjugal affection which includes companionship, comfort, love and solace."

The cause of action brought under the limitation period of R.C. 2305.09 must be commenced within "four years after the cause thereof accrued." Thus, our inquiry must focus on when, in the case *sub judice,* appellant wife's cause of action accrued.

Recently, the Supreme Court clearly stated that "[a]bsent legislative definition, it is left to the judiciary to determine when a cause 'arose' for purposes of statutes of limitations." *O'Stricker, supra,* paragraph one of the syllabus. In *Cincinnati St. Ry. Co.* v. *Whitehead* (1930), 39 Ohio App. 51, paragraph one of the syllabus, the appellate court stated that "[s]tatute of limitations applying to husband's action for loss of wife's services runs from the date of reception of [wife's] injuries." We are also mindful of the well-reasoned and enlightened decision in *Baughman* v. *Bolinger* (S.D. Ohio 1980), 485 F. Supp. 1000, 1003, in which the court stated that "[t]o hold that the statute of limitations governing [plaintiff-wife's] right to sue for loss of consortium was running during the years in which she fully enjoyed that consortium would be to exalt fiction and avoid undeniable reality."

Further, in *Wehman, supra,* based on the facts of that particular case, the Supreme Court, at least by implication, agreed that the statute of limitations for the loss of consortium claim accrued at the same time as did the injured spouse's cause of action.

We recognize that in many instances, as in *Whitehead* and *Wehman, supra,* the accrual of the loss of consortium of one's spouse will, necessarily, coincide with the accrual of that spouse's cause of action. We do, however, also recognize that in a case such as the one we must now decide, the injured spouse's cause of action and his/her spouse's cause of action for loss of consortium may not have accrued at the same time. Restated, consortium may not always be lost when an injured plaintiff knew or reasonably should have known that he/she was injured by the conduct of the defendant. In such cases, it is difficult to imagine how the claim for loss of consortium can accrue, even though the injured spouse's cause of action accrued, if consortium has not been lost.

When a person is injured to the extent that such person is no longer capable of giving love, affection, society and comfort to his or her spouse, that spouse has suffered a direct and real personal loss. *Clouston, supra,* at 74. This loss results in a distinct cause of action for loss of consortium, separate from that of his or her spouse for injuries against the tortfeasor. *Clouston, supra,* at 69. Thus, unless and until consortium has been lost, an action for its loss has not accrued within the meaning of R.C. 2305.09(D).

As the statute of limitations bar is an affirmative defense, and there being no evidence in the record of when appellant-wife lost the consortium of her husband, it was error for the trial court to dismiss appellants' second cause of action. Accordingly, appellants' third assignment of error is well-taken.

### IV

Finally, for our consideration is appellants' second assignment of error, in which appellants state that:

"The lower court prejudicially erred in granting summary judgment in favor of defendants on counts three and four of plaintiffs' first cause of action for the reason that plaintiffs' collective bargain-

ing agreement precludes access to the courts."

At the outset, we recognize that appellee Gravlin stated in his affidavit that at the time of Viock's termination from Stowe-Woodward there was a collective bargaining agreement in effect between Stowe-Woodward and United Auto Workers ("U.A.W.") Local 393. Further, appellee Gravlin stated that at the time of appellant's termination from Stowe-Woodward, appellant was a member of U.A.W. Local 393. As appellant has not produced a countering affidavit on this issue, appellee's affidavit is accepted as true. *Stemen* v. *Shibley* (1982), 11 Ohio App. 3d 263; *Jones* v. *Halekulani Hotel, Inc.* (C.A. 9, 1977), 557 F. 2d 1308, 1310.

Appellees have also submitted the relevant sections of the collective bargaining agreement ("agreement") entered into between appellee Stowe-Woodward and U.A.W. Local 393, of which appellant was a member. Section 7.1 of that agreement defines "grievance" as:

"* * * any dispute between the Company and the Union, or between the Company and any employee, concerning the effect of this Agreement or the interpretation, application, claim of breach or violation of this Agreement. * * * A grievance may be filed by either the Company or the Union or by the employee."

Section 7.4 of the agreement states:

"The grievance procedure and mediation provided for herein shall constitute the sole and exclusive method of determination, decision, adjustment or settlement between the parties of any and all grievances as herein defined and the grievance procedure and *mediation provided herein shall constitute the sole and exclusive remedy to be utilized by the parties hereto for such determination, deci-*sion, adjustment, or settlement of any and all grievances, as herein defined." (Emphasis added.)

The agreement continues:

"7.5 *Mediation*

"* * *

"Any grievance not settled at the final step of the grievance procedure shall be submitted for settlement to the Citizens Labor Management Committee, Toledo, Ohio. ["L.M.C."] * * * *The recommendations of the L.M.C. shall be final and binding on all parties.*" (Emphasis added.)

The union, in the instant case, filed a grievance on behalf of appellant. Essentially, the union claimed that appellee Stowe-Woodward violated Article XIII of the agreement,[14] which article gives appellee Stowe-Woodward the right to discharge employees.

Initially, we note that although Section 7.5 is labeled "Mediation," in essence and in substance it is an arbitration clause, which provides that the union and the company (appellee Stowe-Woodward) shall be bound by the decision of the L.M.C. As this provision provides for the finality of the "recommendation" issued by the L.M.C., the explicit, clear, and unambiguous language utilized in the agreement evinces an unquestionable intent that the "mediation" is to have all the characteristics, forcefulness, effect, and efficacy of an arbitration proceeding. Compare the collective bargaining agreement in the case *sub judice* with the agreements contained in *Ohio Council 8, AFSCME* v. *Ohio Dept. of Mental Health* (Dec. 2, 1982), Montgomery App. Nos. CA-7794 and CA-7808, affirmed (1984), 9 Ohio St. 3d 139; see, generally, *Prentice Funeral Home Co.* v. *Local No. 821*

---

[14] The agreement provides:

"Article XIII — Management Rights

"13.1 Subject to the provision of this Agreement the Union recognizes that the right to hire and to maintain order and efficiency is the sole responsibility of the Company. *The right to promote, transfer, and the right to discipline and discharge for cause are likewise the sole responsibility of the Company.*" (Emphasis added.)

(1968), 16 Ohio App. 2d 29 [45 O.O.2d 100].

It has become a much heralded policy that "* * * arbitration, as a means of settling disputes, is favored and that courts should refuse to review the merits of arbitration awards, seeking to effectuate the policy that labor disputes should be resolved by arbitration." (Citations omitted.) *Graise* v. *Firestone Tire & Rubber Co.* (1979), 65 Ohio App. 2d 119, 121 [19 O.O.3d 71]. Further, provisions as the one now before us are, by statute, valid. R.C. 2711.01.[15]

The record reveals that the arbitrator determined that appellant's grievance must be denied in its entirety. An arbitrator's decision can be vacated or modified only upon those grounds as set forth in R.C. 2711.10[16] and 2711.11.[17] As appellant has not averred that any of these grounds and/or factors existed in his arbitration, the decision of the arbitrator must be final. Accordingly, appellants' second assignment of error is not well-taken.

On consideration whereof, this court finds that substantial justice has not been done the parties complaining, and the judgment of the Erie County Court of Common Pleas is hereby affirmed in part and reversed in part. This cause is remanded to said court for further proceedings not inconsistent with this opinion. Costs to abide final determination.

*Judgment affirmed in part and reversed in part.*

CONNORS, P.J., and DOUGLAS, J., concur.

---

[15] R.C. 2711.01 materially provides:

"A provision in any written contract, except as hereinafter provided, to settle by arbitration a controversy thereafter arising out of such contract, or out of refusal to perform the whole or any part thereof, or any agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, or thereafter arising, from a relationship then existing between them or which they simultaneously create, shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or in equity for the revocation of any contract. * * *"

[16] R.C. 2711.10 states that:

"In any of the following cases, the court of common pleas shall make an order vacating the award upon the application of any party to the arbitration if:

"(A) The award was procured by corruption, fraud, or undue means.

"(B) There was evident partiality or corruption on the part of the arbitrators, or any of them.

"(C) The arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

"(D) The arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

"If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may direct a rehearing by the arbitrators."

[17] R.C. 2711.11 is as follows:

"In any of the following cases, the court of common pleas in the county wherein an award was made in an arbitration proceeding shall make an order modifying or correcting the award upon the application of any party to the arbitration if:

"(A) There was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award;

"(B) The arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted;

"(C) The award is imperfect in matter of form not affecting the merits of the controversy.

"The order shall modify and correct the award, so as to effect the intent thereof and promote justice between the parties."